Cite as 2025 Ark. 4

# SUPREME COURT OF ARKANSAS

ORDER OF CHIEF JUSTICE
KAREN R. BAKER

**Opinion Delivered:** January 8, 2025

---

**KAREN R. BAKER, Chief Justice**

Pursuant to Amendment 80 of the Arkansas Constitution, the Chief Justice is selected in the same manner as the other justices on the court—the people of Arkansas get to decide. *See* Ark. Const. amend. 80, § 2(A)-(B). The associate justices, separately or altogether, cannot overrule the Chief Justice in administering the functions of the court. Stated differently, the associate justices cannot overtake the constitutional duties of the Chief Justice, an elected position, simply because there are more of them. Notwithstanding the will of the people in selecting me to serve in this position, two of my opponents in the Chief Justice race that remain on the court are now attempting to take what the people would not give them by force. However, "Regnat Populus—The People Rule—is the motto of Arkansas. It should ever remain inviolate." *Republican Party of Ark. v. State ex rel. Hall*, 240 Ark. 545, 549, 400 S.W.2d 660, 662 (1966). Thus, I intend to do the job that the people elected me to do.

## I.    Constitutional Authority

When Arkansas became a state in 1836, the supreme court was composed of three judges, one of whom would serve as the Chief Justice. *See* Ark. Const. of 1836, art. 6, § 2. Over time, the number of justices on the court was increased from three to five, and then from five to seven. Despite the changes to the composition of the court throughout the years, the constant has been that the Chief Justice has remained at the helm.

Amendment 80 provides that, "[t]he Supreme Court shall exercise general superintending control over all courts of the state *and* may temporarily assign judges, with their consent, to courts or divisions other than that for which they were elected or appointed. *These functions shall be administered by the Chief Justice.*" Ark. Const. amend. 80, § 4. (Emphasis added). We have long held that language of a constitutional provision that is plain and unambiguous must be given its obvious and common meaning. *See, e.g.*, *Zook v. Martin*, 2018 Ark. 293, 4, 557 S.W.3d 880, 883. As the plain meaning of Amendment 80, section 4 makes clear through the use of the plural word "functions", the Chief Justice is called to administer more than one function of the court. More specifically, through the use of the conjunctive word "and", this language demonstrates that the Constitution requires the Chief Justice to administer two functions—(1) the superintending control over all courts of the state, *and* (2) the temporary assignment of judges. In accordance with the common meaning of the word, to "administer" means "to control the operation or arrangement of something." Administer, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/administer (last visited Jan. 7, 2025). Further, we have interpreted the word "shall" to mean mandatory and require

2

mandatory compliance. *Smith v. Wright*, 2015 Ark. 189, 13, 461 S.W.3d 687, 695. Accordingly, along with my predecessors, I reject any suggestion that the Chief Justice's authority is limited to the assignment of special judges and justices. Amendment 80 does not limit the Chief Justice's authority in such a way, nor was it intended to. Rather, it is my constitutional duty to the people of Arkansas to administer the functions of the court and I will not yield any power that was bestowed upon any Chief Justice before me.

Despite the fact that the Chief Justice retains the sole authority to administer the functions of the court pursuant to the Constitution, at times, I may delegate certain authority to the associate justices individually or as a whole or seek input on administrative matters. I understand that each of the associate justices is a valuable public servant that is vital in maintaining the integrity of the judiciary, and therefore, I appreciate and welcome such input on those discretionary matters. However, a majority vote cannot be used in an attempt to usurp the sole authority of the Chief Justice on administrative matters. This truth, as it has long been understood, was articulated in an order entered by former Chief Justice Kemp upon taking office in 2017 when he was faced with challenges much like those that have manifested in response to me assuming the position of Chief Justice. Kemp explained that his order was in response to "a motion made by Associate Justice Courtney Goodson, who [sought] to establish a *new* rule whereby the Supreme Court of Arkansas would exercise control over administrative matters by a 4-person majority vote." (Emphasis added). In recognizing that this motion, if successful, would improperly strip the Chief Justice of his constitutional authority over administrative matters for the first time since the inception of our court, Kemp held as follows:

This motion can only be understood as an effort to impair the constitutional authority of the Chief Justice. This proposed rule, if implemented, would result in unnecessary delays that impede the administration of justice. Further, this scheme sends a message of conflict and uncertainty to the Arkansas Judiciary.

Under my constitutional authority and duty as Chief Justice as set forth in Amendment 80 of the Arkansas Constitution, and as chairperson of all conferences and meetings of the court, I will not recognize a motion that attempts to (a) override, change, or otherwise impair the administrative authority of the Chief Justice, (b) direct the Chief Justice in his exercise of administrative authority, or (c) establish or exercise any alleged authority of associate justices over administrative matters. Such a motion usurps the constitutional authority of the Chief Justice granted by the Arkansas Constitution. I will not recognize a second to the motion. I object to any vote on any motion made by an associate justice on these administrative matters. I conclude that the efficient administration of the judiciary requires the Chief Justice to exercise authority unencumbered by controversy that comes with seven court members seeking to administer the court by a majority vote.

I hereby rule that a vote on such motion by the associate justices on administrative matters or administrative authority is invalid, null, and void. If, over my objection, the associate justices vote on such matters, then, as Chief Justice, I will enter an order contravening that vote and will declare it invalid, null, and void.

*See* Appendix 1.

In response to this order, the members of the court, most of whom remain on the court today, recognized Kemp's order as an order of the Chief Justice and accepted his authority over administrative matters accordingly. In recognition of the proper function of the court, there were no attempts to overthrow the Chief Justice, and the members of that court conducted themselves in a professional manner. The circumstances underlying Kemp's order were similar to those that necessitate the present order. However, here, not only have five associate justices made and seconded numerous motions regarding administrative matters over my objection, they have purported to enter per curiam opinions creating new

4

rules and making appointments to a commission over my objection. Additionally, five justices attempted to enter into an employment agreement for the AOC Director position to diminish my authority under Amendment 80. Thus, I will respond to improper attempts to commandeer the Chief Justice's constitutional authority over administrative matters precisely how my predecessor vowed to.

II.  Administrative Order 24

On January 3, 2025, five associate justices attempted to issue a per curiam opinion in the form of an administrative order to establish procedures to clarify the employment status of persons working for the Administrative Office of the Courts ("AOC") and the Supreme Court of Arkansas. However, the per curiam is null and void and the purported Administrative Order 24 is stricken pursuant to Amendment 80 of the Arkansas Constitution and relevant statutory law.

In the void January 3 per curiam, the majority states that I lack the authority to terminate the Director of the AOC because the Director serves at the pleasure of the court. First, pursuant to Amendment 80 as discussed above, I am charged with administering the functions of the court which necessarily includes personnel matters within the AOC. Second, the majority failed to reference relevant statutory language. Specifically, section 16-10-102(a)(2) provides that:

> There shall be a Director of the Administrative Office of the Courts *who shall be nominated by the Chief Justice of the Supreme Court*, subject to the approval of the Supreme Court and the Arkansas Judicial Council, Inc. Subsequent to the appointment, the director shall hold office at the pleasure of the Supreme Court.

Ark. Code Ann. § 16-10-102(a)(2). (Emphasis added).

5

The plain meaning of the language above makes clear that the chief justice is entrusted with the sole authority to nominate a Director of the AOC. There is no qualifying language in the preceding statute that restricts the Chief Justice's authority to nominate a Director of the AOC. To be clear, the statute does not contemplate a nomination only upon a vacancy or other triggering event or circumstance, and we have stated that the rules of statutory construction do not permit us to read into a statute words that are not there. *See, e.g., Arkansas Dep't of Fin. & Admin. v. Trotter Ford, Inc.*, 2024 Ark. 31, 9, 685 S.W.3d 889, 896. Thus, as the duly sworn Chief Justice, Arkansas law authorizes me to nominate a Director of the AOC. My predecessor nominated his choice for Director; and I will now nominate mine.

This plain language interpretation of the law makes sense, as I am "directly responsible for the efficient operation of the judicial branch and of its constituent courts and for the expeditious dispatch of litigation therein and the proper conduct of the business of the courts." *See* Ark. Code Ann. § 16-10-101(a). However, even in the absence of the Chief Justice, his or her administrative duties "may be performed by the several associate justices of the Supreme Court in the order of their seniority[.]" Ark. Code Ann. § 16-10-101(d). Therefore, in the event of my absence, the most senior associate justice would be charged with the administration of the court. It is important to note that the court's administrative authority has always been held, and was always meant to be held, by only one person. *See* Appendix 1 ("I conclude that the efficient administration of the judiciary requires the Chief Justice to exercise authority *unencumbered by controversy that comes with seven court members seeking to administer the court by a majority vote*.") (Emphasis added).

6

Accordingly, in order to properly carry out the constitutional responsibilities that come with being the Chief Justice, it is imperative that I, the chief administrator of the court, can exercise my authority to nominate a Director of the AOC that I can trust to assist me in effectively performing my crucial role.

III.   Employment Agreement with Marty Sullivan

On December 10, 2024, five members of the court voted to enter into an employment agreement with Marty Sullivan, Director of the AOC. The agreement between Sullivan and Associate Justices Rhonda Wood, Shawn Womack, Barbara Webb, and Cody Hiland, along with former Chief Justice Kemp, purports to provide Sullivan with employment for eight years ending on December 31, 2032, totaling approximately 1.6 million dollars. *See* Appendix 2.

I consider Sullivan's signature on the purported agreement for the provision of his professional services to be his resignation as a state employee. Pursuant to Arkansas law, it is a breach of an employee's ethical standards "to participate directly or indirectly in any proceeding or application, in any request for ruling or other determination, in any claim or controversy, *or in any other particular matter pertaining to any contract* or subcontract, and any solicitation or proposal therefor, in which to the employee's knowledge . . . [t]he employee or any member of the employee's immediate family has a financial interest[.]" Ark. Code Ann. § 19-11-705(a)(1)(A). The purported agreement provides for a substantial salary and benefits package for Sullivan, and also provides that, "[t]his Agreement is deemed to have been drafted jointly by the Parties" which includes Sullivan. Therefore, Sullivan would have had to resign in order to enter into the purported employment agreement.

Additionally, this contract is illegal, as it was entered in contravention of Amendment 80. When former Chief Justice Kemp was elected, he nominated Sullivan to serve as the Director of the AOC. I was elected to serve as the Chief Justice beginning January 1, 2025. Therefore, Amendment 80 requires me to administer the functions of the court, which necessarily includes personnel matters within the AOC, such as those involving the Director. However, shortly before I was slated to become the Chief Justice, five members of that court attempted to commandeer my authority by executing the agreement which provides that Sullivan will remain the Director of the AOC for the duration of my term. If this were allowed to stand, I would not be permitted to perform my duties as constitutionally required of the Chief Justice for the eight years I have been sworn to serve.

IV.     Appointments to the Arkansas Judicial Discipline and Disability Commission

As noted by former Chief Justice Kemp, the Chief Justice is the chairperson of all conferences and meetings of the court. *See* Appendix 1. As the duly sworn Chief Justice of the Arkansas Supreme Court, I informed the court that the first business meeting of 2025 would be held on January 23 to take up various administrative matters. Further, I set January 16 as the deadline for adding items to the agenda for this meeting. In spite of this, on January 6, five associate justices convened an unauthorized business meeting while the court was in recess. During the meeting, the participating members discussed appointments to the Arkansas Judicial Discipline and Disability Commission ("JDDC") and voted to issue a per curiam reappointing Circuit Judge Earnest Brown and appointing Circuit Judges Thomas Smith and Troy Braswell to the JDDC. The full court would have had ample opportunity to resolve any issues regarding the appointments to the JDDC at the business meeting

8

scheduled on January 23, as there was no emergency necessitating an unsanctioned business meeting during the court's recess. However, rather than waiting for the meeting of the full court, the five participating justices decided to proceed with a meeting outside the court's normal course of business and vote to approve three appointments in the absence of the two most senior justices on the court, including myself, the Chief Justice.

In an attempt to come to a reasonable resolution to this issue, I advised the writing justice that I did not object to the reappointment of Judge Brown or the appointment of Judge Smith to the JDDC. However, I reminded the writing justice that I have a standing objection to the appointment of Judge Braswell to the JDDC as I understand that he harbors actual bias toward me. The court's longstanding custom and practice dictates that an appointment is invalid if any member of the court raises an objection to the proposed appointee for any reason. In the past, my objection to Judge Braswell for cause would have been more than sufficient to warrant the selection of a replacement appointee. My objection to the appointment of Judge Braswell has been known to the full court since October 2024, and the JDDC appointments therefore remained pending under my predecessor's leadership. However, the writing justice rejected my genuine attempt to reach a peaceable resolution, refused to adhere to the court's custom and practice, and indicated instead that Judge Braswell's appointment to the JDDC was the official decision of the court, notwithstanding the bias I had raised, given that a majority voted in favor of his appointment. I have no agenda that compels me to support any person in particular for potential appointments aside from choosing individuals that will serve as dedicated stewards to the court's various boards

and committees. Under the present circumstances, I do not believe such is the case for one of the three appointees supported by five members of the court.

Accordingly, this is yet another instance wherein the majority has attempted to improperly wield the constitutional authority of the Chief Justice over administrative matters. As a result, the per curiam making appointments to the JDDC is null and void and the purported appointments are stricken pursuant to Amendment 80 of the Arkansas Constitution.

## V.    Conclusion

The constitutional office of the Chief Justice is an elected position for a reason. I am the people's choice for Chief Justice—not any of the associate justices, whether together or separate. The State of Arkansas would greatly benefit from an efficient judiciary. To accomplish this, the associate justices must divert their fixation from the constitutional duties and responsibilities of the Chief Justice, and instead, dedicate their full attention to the duties in which they were elected or appointed to carry out.

Pursuant to Amendment 80, the ultra vires per curiam opinions issued on January 3 and January 6 are null and void, and the purported Administrative Order 24 is stricken.

It is so ordered.

## STATEMENT OF CHIEF JUSTICE JOHN DAN KEMP
## TO ASSOCIATE JUSTICES

The citizens of Arkansas benefit from a supreme court that demonstrates continuity, stability, and consistency. Our judiciary must state a clearly articulated mission, must set forth values of efficient operation, and must present a unified message to all Arkansans.

Before this court is a motion made by Associate Justice Courtney Goodson, who seeks to establish a new rule whereby the Supreme Court of Arkansas would exercise control over administrative matters by a 4-person majority vote. This motion can only be understood as an effort to impair the constitutional authority of the Chief Justice. This proposed rule, if implemented, would result in unnecessary delays that impede the administration of justice. Further, this scheme sends a message of conflict and uncertainty to the Arkansas judiciary.

Under my constitutional authority and duty as Chief Justice as set forth in Amendment 80 of the Arkansas Constitution, and as chairperson of all conferences and meetings of the court, I will not recognize a motion that attempts to (a) override, change, or otherwise impair the administrative authority of the Chief Justice, (b) direct the Chief Justice in his exercise of administrative authority, or (c) establish or exercise any alleged authority of associate justices over administrative matters. Such a motion usurps the constitutional authority of the Chief Justice granted by the Arkansas Constitution. I will not recognize a second to the motion. I object to any vote on any motion made by an associate justice on these administrative matters. I conclude that the efficient administration of the judiciary requires the Chief Justice to exercise authority unencumbered by controversy that comes with seven court members seeking to administer the court by a majority vote.

I hereby rule that a vote on such motion by the associate justices on administrative matters or administrative authority is invalid, null, and void. If, over my objection, the associate justices vote on such matters, then, as Chief Justice, I will enter an order contravening that vote and will declare it invalid, null, and void. The order will be filed in the Clerk's office of the Arkansas Supreme Court, and it shall be a public record. This statement shall be attached to my order and shall also be made a public record.

_____
Chief Justice John Dan Kemp

_____
Feb. 15, 2017
Date

**RECEIVED**

DEC 1 7 2024

**CLERK'S OFFICE**

## EMPLOYMENT AGREEMENT

Employment Agreement ("Agreement"), dated as of December 14, 2024, is between Marty Sullivan (Employee) and the Arkansas Supreme Court, which includes the Administrative Office of the Courts (Employer) (collectively, the Parties).

## Preamble

- Arkansas Code Annotated § 16-10-102 provides for the administration of the nonjudicial business of the judicial branch in the Administrative Office of the Courts (AOC). It states that the Director shall be nominated by the Chief Justice of the Supreme Court, subject to the approval of the Supreme Court and the Arkansas Judicial Council, Inc., and that subsequent to the appointment, the Director shall hold office at the pleasure of the Supreme Court.

- In March 2017, Chief Justice John Dan Kemp nominated Employee to serve as Director of the AOC and the Supreme Court and the Arkansas Judicial Council, Inc. approved it.

- Since March 16, 2017, Employee has served as Director of the Arkansas Supreme Court's Administrative Office of the Courts.

- On December 10, 2024, the Arkansas Supreme Court, upon proper motion, voted that it desired that Employee continue serving in the role of Director, but also that it provide Employee with a contract. A contract resolves any disputes over the language "at the pleasure of the Supreme Court."

- Employee possesses considerable experience in court administration, and the AOC has made substantial investments in Employee's development and training throughout the course of his employment.

- To provide Employee with assurances of continued employment for at least a term of eight (8) years, and to protect the AOC's investment in Employee, the Parties have negotiated a mutually satisfactory arrangement for the employment of Employee by Employer.

NOW THEREFORE, in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## Terms

1. **Employment.** Employer hereby employs Employee in accordance with the terms and conditions set forth in this Agreement, to serve as Director of the AOC and to perform the duties of such office as defined from time to time by Employer consistent

with the job description attached as **Exhibit A** and incorporated in this Agreement, and Employee hereby accepts such employment upon the terms and conditions set forth in this Agreement, and agrees to use Employee's best efforts at all times to operate the AOC. Employee further agrees that he will maintain the level of duties and responsibilities now in effect, and such additional level of duties and responsibilities as Employee may reasonably be assigned by Employer during the Term of this Agreement.

2. **Standard of Services of Employee.** During the Term of this Agreement, Employee agrees to devote substantially all of Employee's business-related time, attention, and effort to performing the duties of Director of AOC, and Employee shall not engage in any other outside business activity, whether or not such business activity is pursued for gain, profit, or other pecuniary advantage, without Employer's approval. Employee further covenants and agrees that Employee shall devote Employee's full and best efforts to the fulfillment of Employee's obligations under this Agreement and that Employee will exercise the highest degree of loyalty and the highest standards of conduct in the performance of Employee's duties.

3. **Effective Date.** This Agreement shall become effective upon execution, pursuant to a majority vote of the Justices of the Arkansas Supreme Court approving this Agreement on **December 10, 2024**.

4. **Term.** The Term of this Agreement is for eight (8) years beginning on the Effective Date and continuing until December 31, 2032 at 11:59 p.m. At the expiration of the term of service under this contract, Employee will continue to serve as an at will employee subject to the pleasure of a majority of the members of the Arkansas Supreme Court, unless or until the contract is renewed, extended, or modified.

5. **Compensation.** As compensation for the services rendered by Employee, Employer agrees to pay Employee a base salary and other compensation as follows:

6. **Base Salary.** Base Salary shall begin at $199,650. During each year of the Term, Employer shall pay Employee not less than $199,650 pursuant to this Agreement, with payments made in accordance with Employer's existing or then-current payroll schedule. Employee shall receive an annual performance evaluation from each of the Justices of the Arkansas Supreme Court. Employee shall receive, at a minimum, the same percentage of cost-of-living adjustments (C.O.L.A.s) or raises provided to other members of the leadership team of the AOC or the other entities under the control of the Arkansas Supreme Court. Unless otherwise noted or required, any C.O.L.A. or raise given to Employee shall become part of his newly calculated Base Salary. Employer may otherwise increase Employee's Base Salary at Employer's discretion; however, Employer shall never decrease Employee's Base Salary during the Term of this Agreement.

7.  **Miscellaneous Benefits.** During the term of this Agreement, Employee shall be eligible to participate in all employee benefit programs offered to similarly-situated employees of the State of Arkansas, including all insurance, retirement, and leave-related programs. Employee shall continue to accrue paid leave and related benefits in accordance with Employer's Employment Handbook and related benefit programs.

8.  **Taxes.** To the extent required by applicable law, Employer shall deduct and withhold all necessary Social Security taxes and all necessary federal and state tax withholding and any other similar sums required by laws to be withheld from any payments made pursuant to the terms of this Agreement. Employer may withhold all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling from any benefits payable under this Agreement.

9.  **Expenses.** During the term of this Agreement, Employer shall pay or reimburse Employee for all ordinary and necessary expenses that are reasonably incurred by Employee in performing Employee's duties under this Agreement in accordance with established policy, which may be amended from time to time, by new Agreements between Employer and Employee, an addendum to this Agreement, or as incorporated within an approved budget for Employer.

10. **Termination By Employer; For-Cause Only.** During the Term, Employee will serve at the "pleasure of the court" which means this Agreement may only be terminated by Employer "For Cause," which means the occurrence of one of the following For-Cause Events, as determined by a majority vote of the Justices of the Arkansas Supreme Court:

    **A.      Employee Engaging in Substantial Misconduct Amounting to Cause for Termination.** Substantial misconduct amounting to cause for termination means: (a) embezzlement, theft, larceny, material fraud, or other acts of material dishonesty by Employee; (b) intentional disregard of Employee's duties under this Agreement or any other material violation by Employee of this Agreement; (c) arrest for, conviction of, or entrance of a plea of guilty or nolo contendere to a felony or other crime by Employee which has or may have a material adverse effect on Employee's ability to carry out his duties under this Agreement or upon the reputation of Employer; (d) conduct of Employee involving moral turpitude; (e) any incidence of violence in the workplace by Employee; (f) material and continuing failure by Employee to perform the duties described in Exhibit A for at least thirty (30) days after written warning and an opportunity to cure is presented to Employee by Employer's authorized representative. Upon termination for cause, Employer's sole and exclusive obligation will be to pay Employee his base compensation and benefits earned and expenses incurred through the date of termination, and Employee shall not be entitled to any compensation after the date of termination.

**B.** **Termination by Employee for Good Reason.** Employee may terminate this Agreement for "good reason," which means (a) the material diminution of Employee's duties, managerial responsibilities, and compensation; (b) Employer's creation of a hostile work environment for Employee; and (c) Employer's breach of this Agreement (Good Reason Events). If a Good Reason Event occurs, Employee shall provide written notice to Employer and provide Employer with a period of thirty (30) days within which to cure. If Employer fails to cure a Good Reason Event after notice of a Good Reason Event has been delivered to Employer by Employee, then Employer shall be deemed to have terminated this Agreement without cause in breach of Section 10 of this Agreement.

**C.** **Breach by Employer or Termination by Employee for Good Reason.** In the event Employer breaches this Agreement by terminating this Agreement in violation of Section 10, or if Employee terminates this Agreement for "good reason" as set forth in Section 10, Employer shall compensate Employee as follows. Employer shall continue to pay Employee a compensation package (Payout) for up to three years. The Payout shall be paid out in monthly installments such that Employee shall receive the total monthly compensation Employee was receiving for salary and all benefits at the time of termination of the Agreement for a period of three years. Employee has a duty to mitigate, but Employer shall continue to pay the difference between any new salary and Employee's compensation package at time of termination of this Agreement for a period of three years. If there are less than three years remaining under the term of this Agreement, then Employee's Payout will be reduced to the years remaining under the contract.

11. **Dispute Resolution.** As described below, the Parties agree that any dispute arising between them regarding the continued employment of Employee shall be subject to binding arbitration governed by the Federal Arbitration Act. Any remaining disputes arising from this relationship that, for any reason are not subject to arbitration, are beyond the scope of arbitration, or are unable to be resolved by arbitration shall be resolved by the Arkansas Claims Commission or other government entity with jurisdiction over the matter. Employer agrees to take all lawful action necessary, appropriate, and helpful to ensure that the Arkansas Claims Commission and any other applicable government actor approves and funds the payment of all of Employee's claims that have been determined to be valid and enforceable under the terms of this contract. Employer's duties pursuant to this Section include but are not limited to advocating for, approving budgets, and seeking any necessary legislative appropriations to ensure that Employee's claims are fully paid.

12. **Assignment by Employer.** This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of Employer, and any such successor shall be deemed substituted for all purposes of Employer under the terms of this Agreement as used in this Agreement,

the term "successor" shall mean a successor by reason of a change in the membership of the Arkansas Supreme Court. Notwithstanding such assignment, or failing such assignment, Employer shall remain, with such successor, jointly and severally liable for all its obligations hereunder only in its official capacity and nothing herein shall create any individual personal liability for any member of the Arkansas Supreme Court.

13. **Death or Disability.**
    A. **Employee's Death**. In the event Employee dies during the Term of this Agreement, Employer shall pay to the beneficiary designated by Employee during Employee's lifetime, or to Employee's estate as appropriate, all benefits to which Employee had a vested right pursuant to this Agreement. Upon Employee's death, further compensation payments shall cease, and this Agreement shall terminate.

    B. **Employee's Disability**. Employee will be deemed to be under a "disability" if, for physical or mental reasons, Employee is unable to perform his essential duties under this Agreement for one-hundred twenty (120) consecutive days, or one hundred twenty (120) days during any twelve (12) month period, provided that Employer has attempted to accommodate the disability as required by law.

14. **Notice.** All notices, requests, and other communications to any Party under this Agreement shall be in writing and shall be given to such Party at its address set forth below or such other address as a Party may hereafter specify for the purpose by notice to the other Party or, if to Employee, the last address Employee has filed with the Employer:

    **If to Employer:**    Arkansas Supreme Court
        625 Marshall Street, Suite 1100
        Little Rock, AR 72201

    **If to Employer:**    Marty Sullivan
        P.O. Box 592
        Little Rock, AR 72203

Each such notice, request or other communication shall be effective (i) if given by mail, seventy-two (72) hours after such communication is deposited in the United States Mail with first class postage prepaid, addressed as aforesaid or (ii) if given by any other means, when delivered at the address specified in this Section 11.

15. **Modification of Agreement.** No waiver or modification of this Agreement or of any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the Party to be charged therewith. No evidence of any waiver of modification shall be offered or received in evidence at any proceeding, arbitration, or litigation between the Parties hereto arising out of or affecting this Agreement, or the rights or obligations of the Parties hereunder, unless such waiver or modification is in writing, duly executed as aforesaid. The waiver by Employer or Employee of a breach

of any of the provisions of this Agreement by Employee or Employer shall not be construed as a waiver of any subsequent breach by Employer or Employee.

16. **Entire Agreement.** This Agreement supersedes any prior agreements or understanding, oral or written, between the Parties hereto or between Employee and Employer, with respect to the subject matter hereof and constitutes the entire Agreement of the Parties with respect thereto, except as referred to herein.

17. **Severability.** In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect.

18. **Mutual Drafting.** This Agreement is deemed to have been drafted jointly by the Parties and, in the event of a dispute, shall not be construed in favor of or against any Party by reason of such Party's contribution to the drafting of this Agreement. The Parties acknowledge and agree that they have reviewed this Agreement, have had this Agreement reviewed by competent counsel, and they are now entering into this Agreement voluntarily. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same agreement. Signatures delivered by facsimile or PDF or similar technology shall have the same force and effect as original signatures.

19. **Recitals.** The Recitals to this Agreement are incorporated herein and shall constitute an integral part of this Agreement.

20. **Governing Law; Arbitration.** The Parties intend that this Agreement and the performance hereunder and all suits and special proceedings hereunder shall be construed in accordance with and under and pursuant to the laws of the State of Arkansas, and that in any action, special proceeding or other proceeding that may be brought arising out of, in connection with, or by reason of the Agreement, the laws of the State of Arkansas, shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted. Further, the Parties agree that any dispute arising out of or relating to this Agreement shall be resolved through binding arbitration governed by the Federal Arbitration Act pursuant to the American Arbitration Association's Employment Arbitration Rules. Arbitration shall take place in Pulaski County, Arkansas, unless otherwise agreed to by the Parties. Arbitration confirmation proceedings shall be commenced in an appropriate court or other entity with enforcement powers and jurisdiction in Pulaski County, Arkansas, or other venue as agreed to by the Parties.

21. **Section 409A.**

**A.** Anything in this Agreement to the contrary notwithstanding, if at the time of Employee's separation from service within the meaning of Section 409A of the United States Internal Revenue Code (the Code), Employer determines that Employee is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that Employee becomes entitled to under this Agreement on account of Employee's separation from service would be considered deferred compensation subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after Employee's separation from service, or (B) Employee's death. If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with its original schedule. Solely for purposes of Code Section 409A, Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

**B.** All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by Employer or incurred by Employee during the time periods set forth in this Agreement. All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred. The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year. Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

**C.** To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon Employee's termination of employment, then such payments or benefits shall be payable only upon Employee's "separation from service." The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A1(h).

**D.** This Agreement is intended to comply with Section 409A of the Code or an exemption thereunder and shall be construed and administered in accordance with Section 409A of the Code. To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code. The Parties agree that this Agreement may be amended, as reasonably requested by either Party, and as may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without

additional cost to either Party so long as such changes are consistent with the original economic intent of the Parties.

22. **Further Assurances.** The Parties agree to execute and deliver such other documents, and to do such other acts and things for the purpose of carrying out the intent of this Agreement. For instance, if Employer believes that a per curium opinion of the Court is necessary and advisable to ensure the validity and enforcement of this Agreement, Employer may perform such official acts as necessary to consummate this Agreement.

23. **Authority to Execute and Enter into Agreement.** Each Party represents and warrants that: (a) it has the full power and authority to enter into and perform its obligations under this Agreement; (b) the execution, delivery, and performance of this Agreement has been duly authorized by all necessary constitutional, administrative, and organizational action by a majority of the Justices of the Arkansas Supreme Court; and (c) the individual(s) signing this Agreement on behalf of each Party has or have been duly authorized to execute this Agreement and bind the Party to its terms.

**IN WITNESS WHEREOF,** Employee and Employer have executed this Agreement on the dates set forth below.

<u>**EMPLOYEE**</u>

Date: 12·17·24

_____
Marty Sullivan, individually

<u>**ARKANSAS SUPREME COURT**</u>

Date: 12-17-24

_____
Chief Justice Dan Kemp

Date: 12-15-24

Date: 12-16-24

Date: 12-17-24

Barbara W. Webb                          Date: 12/17/24

_____          Date: _____

_____          Date: _____


**EXHIBIT A**
**[AOC DIRECTOR JOB DESCRIPTION]**



# Administrative Office of the Courts
## Job Description

| Job Title: | Agency Director | Grade: | SE04 |
|---|---|---|---|
| Division: | Administrative Office of the Courts | Revision Date: | 12/20/2024 |

**POSITION SUMMARY:**
The agency director is responsible for both long-term strategic planning and day-to-day operations of the Administrative Office of the Courts (AOC). Primary responsibilities include maintaining interbranch relationships, advising the Supreme Court on administrative methods of the judiciary, supervising and directing the AOC, and acting as secretary of the Arkansas Judicial Council. The agency director is supervised by the Supreme Court.

**JOB DUTIES:**
- Collect, analyze, and report to the Supreme Court statistical and other data concerning the business of the courts;
- Develop and maintain relationships with stakeholders, including judges, court staff, legislators, Executive Branch officials, and the Arkansas Bar Association.
- Educate legislators and other policymakers regarding the function of Arkansas courts and on projects supported by the Supreme Court, Judicial Council, or the AOC.
- Make recommendations to the Supreme Court regarding court technology systems designed to improve the quality and efficiency of justice;
- Develop and maintain a system of judicial education for judges and court staff;
- Develop and maintain a program of public education regarding state courts;
- Present agency appropriation recommendations to the Supreme Court;
- Develop and maintain organizational structure for the AOC;
- Make, or designate to AOC leadership staff, AOC personnel decisions, including hiring, termination, and compensation.
- Other duties as assigned by the Supreme Court.

**QUALIFICATIONS:**
- A bachelor's degree is required, with an advanced degree preferred.
- A minimum of eight years of administrative experience in court management, including at least five years of extensive and substantial management responsibility.
- Experience working with the Legislature is preferred.

**KNOWLEDGE, SKILLS, AND ABILITIES:**
- Knowledge of the Arkansas court system, case management operations and processes, and relevant state government procedures.
- Demonstrated excellent written and oral communication abilities.
- Strong interpersonal and analytical skills.
- Ability to travel regularly.